**Milo Petranovich**, OSB No. 813376
petranovichm@lanepowell.com
**Tanya D. Urbach**, OSB No. 962668
urbacht@lanepowell.com
**LANE POWELL PC**
601 SW Second Avenue, Suite 2100
Portland, Oregon 97204-3158
Telephone: 503.778.2100
Facsimile: 503.778.2200

Attorneys for Defendant Henrik Norremark

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| In re IN RE VESTAS WIND SYSTEMS A/S SECURITIES LITIGATION | Case No. 3:11-cv-00585-AC <br><br> <u>CLASS ACTION</u> |
| This Document Relates To: <br><br> ALL ACTIONS. | **MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** <br><br> **By Defendant Henrik Nørremark** |

### I.   INTRODUCTION

Plaintiffs allege that Vestas Wind Systems A/S ("Vestas"), Vestas-American Wind Technology, Inc. ("VAWT"), Brent Erik Carlsen ("Carlsen"), Ditlev Engel ("Engel"), and Henrik Nørremark ("Nørremark") are each liable pursuant to section 10(b)(5) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder for alleged misrepresentations concerning whether Vestas' revenue recognition procedures for supply-and-installation contracts

PAGE 1 -   MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

complied with Interpretation 15 of the International Financial Reporting Interpretations Committee regarding Agreements for the Construction of Real Estate ("IFRIC 15"). Plaintiffs further allege that Carlsen, Engel, and Nørremark are liable as control persons for Vestas' actions pursuant to section 20(a) of the Securities and Exchange Act. However, for the reasons set forth more particularly here and in the Memorandum of Law in Support of Motion to Dismiss filed by Vestas and VAWT (the "Vestas Defendants' Memorandum"), plaintiffs' First Amended Complaint ("FAC") should be dismissed pursuant to Rules 9 and 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted.

Nørremark joins in, and adopts, the Vestas Defendants' Memorandum, but also submits this memorandum to address two additional issues, both of which concern whether plaintiffs have sufficiently alleged facts giving rise to an inference of scienter – they have not. As is set forth more particularly below, Nørremark's stock sale cannot establish a strong inference of scienter. Similarly, the confidential witness statements alleged in the FAC at paragraphs 18, 153, 154 and 155 do not give rise to a strong inference of scienter, *inter alia*, because plaintiffs have failed to plead the reliability and personal knowledge of the witnesses. Thus, the FAC should be dismissed.

## II.    SUPPLEMENTAL BACKGROUND

At all times material to the FAC, Engel and Nørremark were the only members of Vestas' Executive Management Group. (FAC ¶ 39.) Engel was President and Chief Executive Officer of Vestas. (*Id.*) Nørremark was Vestas' Executive Vice President and Chief Financial Officer. (*Id.* ¶ 41.) Carlsen was, at all material times, the Chairman of the Board of Directors of Vestas. (FAC ¶ 37.) Prior to 2009, Nørremark had acquired 3,213 shares of Vestas. (Declaration of Tanya D. Urbach in Support of Nørremark's Request for Judicial Notice ("Urbach Decl.") Ex. 1 at 101.) As of January 1, 2010, Executive Management's combined shareholdings were 3,437 – Engel owned 224 shares and Nørremark owned 3,213. (*Id.*) Further, Nørremark and Engel

PAGE 2 -    MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

**LANE POWELL PC**
601 SW SECOND AVENUE, SUITE 2100
710269.0001/5654152.1                                PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

collectively held 16,378 options at the end of 2010, all of which options were exercisable during 2010. (Urbach Decl. Ex. 2 at 117.)

Vestas' internal rules regarding insider trading by Vestas' Board of Directors, Executive Management, and certain employees only permit trading in the four weeks following the publication of the annual report and quarterly reports. (Urbach Decl. Ex. 1 at 101.) Consistent with this policy, five days following Vestas' February 10, 2010, publication of its 2009 Annual Report, Nørremark sold 3,000 of his Vestas shares for 817,920 DKK (approximately €109,701.88 or $144,160.04) or 272.64 DKK per share. (FAC ¶¶ 16, 42, 44, 81, Urbach Decl. Ex. 6.)

In addition to Vestas' Executive Management Group, many of the directors, officers, and other employees of Vestas owned Vestas shares. Public records show that, of the 20 directors, officers, and other officials whose transactions Vestas publicly reported in its periodic filings pertinent to the class period, only *one* of them (in addition to Nørremark) sold any shares during the class period, and that one person was neither a director nor a member of executive management.[1] (Urbach Decl. Exs. 3-22.) None of the others persons – including the CEO Ditlev Engel and *all* members of the Board, and all other members of top management – sold a single share. (*Id*.)

In fact, Vestas insiders were actually *buying* – not selling – Vestas stock during the class period. (*Id*.) In 2009 and 2010, when Vestas was allegedly misrepresenting its financial condition, 19 Vestas insiders – including defendants Engel (the CEO) and Carlsen (the Chairman of the Board), and all other Board members – *purchased* some 36,064 shares of Vestas stock.

- In 2009, the Board of Directors' total holdings of Vestas shares *increased* by 200 shares, from 112,917 to 113,117 shares. (Urbach Decl. Ex. 1 at 101.)

---

[1] That person was Søren Lomholt Husted, President of Vestas Nacelles, who exercised 2,550 stock options and then sold the shares in May 2010. (Urbach Decl., Ex. 8.) However, even Mr. Husted *purchased* an additional 500 shares three months later, on August 18, 2010, and held those shares past the end of the class period. (*Id*. Ex. 10.)

PAGE 3 -   MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

- In 2010, the Board of Directors' total holdings of Vestas shares *increased* by 20,512 shares, from 113,117 to 133,629 shares. (Urbach Decl. Ex. 2 at 117.)

- Messrs. Engel and Carlsen, the other two individually named defendants, *bought* 2,000 and 8,000 shares, respectively, on August 19 and 18, 2010 – six months *after* Nørremark's February 2010 sale. (*Id*.; *see also* Urbach Decl. Exs. 12, 11.)

Plaintiffs allege that Nørremark's February 15, 2010 stock sale is evidence of the intentional nature of the misrepresentations allegedly made by defendants, including Nørremark. However, during the time Vestas and its executive management team are alleged to have artificially inflated the stock price – February 11, 2009 through November 19, 2010 (FAC ¶ 1) – Vestas issued several Annual and Interim financial reports.[2] Per Vestas' insider trading policy, Nørremark was permitted to sell his shares within 28 days following any one of these financial reports. During the 28-day period following the publication of these financial reports Vestas' stock price was often higher, at times significantly higher, than the price at which Nørremark sold his shares. In fact, Nørremark could have sold his shares for more than he sold them for on February 15, 2010 on dates following all but two of the financial reports issued during the alleged class period. The chart below indicates the highest price[3] Vestas' shares traded at within the 28-day period following each of the financial reports issued during the alleged class period.

| Financial Report | Date of Report | Date within 28 days following Financial Report | Vestas High Share Price in 28 days following financial report | Difference between price per share Nørremark sold for and high price in 28 days following financial report |
|---|---|---|---|---|
| 2008 Annual Report | Feb. 11, 2009 | | | |

---

[2] Vestas issued its 2008 Annual Report on February 11, 2009 (FAC ¶58) and issued interim reports on April 28, 2009 (FAC ¶ 62), August 18, 2009 (FAC ¶ 66), and on October 27, 2009 (FAC ¶ 70). Vestas issued its 2009 Annual Report on February 10, 2010 (FAC ¶ 76), followed by interim reports on April 28, 2010 (FAC ¶ 85), August 18, 2010 (FAC ¶ 95), and October 26, 2010 (FAC ¶101).
[3] Pursuant to Rule 201(b) of the Federal Rules of Evidence ("FRE") the Court may take judicial notice of these stock prices. *See* Nørremark's Request for Judicial Notice filed concurrently herewith.

PAGE 4 -   MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

|  |  | Feb. 16, 2009 | High 314.00 DKK | +41.36 DKK |
|---|---|---|---|---|
| 1Q09 Report | Apr. 28, 2009 |  |  |  |
|  |  | May 5, 2009 | High 429.50 DKK | +156.86 DKK |
| 2Q09 Report | Aug. 18, 2009 |  |  |  |
|  |  | Sep. 10, 2009 | High 404.50 DKK | +131.86 DKK |
| 3Q09 Report | Oct. 27, 2009 |  |  |  |
|  |  | Nov. 9, 2009 | High 390.75 DKK | +118.11 DKK |
| 2009 Annual Report | Feb. 10, 2010 |  |  |  |
|  |  | Feb. 23, 2010 | High 297.70 DKK | +25.06 DKK |
| 1Q10 Report | Apr. 28, 2010 |  |  |  |
|  |  | May 4, 2010 | High 346.20 DKK | +73.56 DKK |
| 2Q10 Report | Aug. 18, 2010 |  |  |  |
|  |  | Aug. 19, 2010 | High 250.40 DKK | -22.24 DKK |
| 3Q10 Report | Oct. 26, 2010 |  |  |  |
|  |  | Oct. 27, 2010 | High 183.70 | -88.94 DKK |

For 2009, Engel and Nørremark earned combined salaries of €1,400,000 (approximately $1,846,739), together with an additional €700,000 (approximately $923,370) in bonus in 2009. Thus, their collective earnings in 2009 were €2,100,000 (or $2,770,109). (Urbach Decl. Ex. 1 at 33-34.) Executive Management's only stock sale during this same period – the single sale by Nørremark of $144,160 in Vestas' shares – pales in comparison to Executive Management's overall compensation.

As will be demonstrated below, this publicly available information eviscerates plaintiffs' effort to establish a strong inference of scienter based on Nørremark's single stock sale.

### III.   LEGAL ANALYSIS

**A.   Plaintiffs Fail to Allege Sufficient Facts Concerning Insider Trading, and therefore Nørremark's Alleged Stock Sale Does Not Raise a Strong Inference of Scienter.**

Plaintiffs try to bolster their allegations of scienter by pleading that Nørremark (Vestas' CFO) sold "virtually all" of his Vestas stock during the class period. (FAC ¶¶ 16, 42, 44, 81.) But "insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." To determine "whether stock sales raise a strong inference of deliberate recklessness," courts consider "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading

PAGE 5 -   MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

history." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1005 (9th Cir. 2009) (internal quotation marks omitted).

Nørremark's stock sale cannot establish a strong inference of scienter because (i) the Vestas insiders collectively *bought* substantially more shares during the alleged class period than they sold – Nørremark was virtually the *only* insider who sold during the class period – with one minor exception, all others (including defendants Engel and Carlsen) held all of their shares and purchased more, and (ii) the sale was not otherwise "suspicious."

1.      **There were no other significant insider sales, but many insider purchases.** Under the first factor cited in *Zucco Partners* – "the amount and percentage of shares sold by insiders" – courts consider not only a particular insider's stock sales, but the *total* amount of shares sold by *all insiders* during the class period. "One insider's well-timed sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way that is inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001).

Thus, where other insiders did *not* sell stock during the relevant period, one inside seller's sales will not be considered suspicious regardless of the amount he or she sold. *See, e.g., Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (lack of sales by other insiders "suggest[s] that there was no insider information from which to benefit"); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002) (fact that all other directors and officers held their shares as price fell undercuts inference of scienter); *Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093-94 (9th Cir. 2002) (same where most other insiders did not sell).

Plaintiffs here do not allege that any other Vestas insider sold stock during the class period. To the contrary, public records show that of the 20 directors, officers, and other officials whose transactions Vestas publicly reported in its periodic filings, only *one* of them (in addition to Nørremark), Mr. Husted, sold any shares during the class period, and he was neither a director

PAGE 6 -   MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

nor a member of executive management. None of the others persons – including the CEO, *all* members of the Board, and all other members of top management – sold a single share. When viewed in context of this publicly available information, Nørremark's stock sale simply fails to establish any inference of scienter, let alone a strong inference of scienter.

In fact, insiders here were actually *buying* Vestas stock during the class period. In 2009 and 2010, when Vestas was allegedly misrepresenting its financial condition, 19 Vestas insiders *purchased* some 36,064 shares of Vestas stock. In 2009, the Board of Directors' total holdings of Vestas shares *increased* by 200 shares, from 112,917 to 113,117 shares. (Urbach Decl. Ex. 1 at 101.) In 2010, the Board of Directors' total holdings of Vestas shares *increased* by 20,512 shares, from 113,117 to 133,629 shares. (Urbach Decl. Ex. 2 at 117.) Messrs. Engel and Carlsen *bought* 2,000 and 8,000 shares, respectively, on August 19 and 18, 2010 – six months *after* Mr. Nørremark's February 2010 sale. (*Id*.; *see also* Urbach Decl. Exs. 10, 12.)

These total insider *purchases* constituted more than 86% of the total insider transactions (including Mr. Nørremark's sale of 3,000 shares) during the class period. (Urbach Decl. Exs. 3-22.) Significantly, Vestas' CEO, Engel, and Chairman of the Board, Carlsen, each of whom are alleged to be personally liable in this case, both purchased shares during the time the stock price is alleged to be artificially high as a result of their alleged knowing misrepresentations. The overwhelming net *purchases* by company insiders, including those alleged to be most intimately involved, at a time when Vestas was allegedly trying to inflate its stock price further destroys any inference of scienter. *See, e.g., Lilley v. Charren*, 17 Fed. Appx. 603, 609 n.2 (9th Cir. 2001) (affirming dismissal of securities-fraud claims for lack of scienter where most insiders had held their stock throughout class period and others had purchased additional shares during that time);[4] *Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995) (acquiring shares is "a position unlikely to be taken by an insider who has unpublished

---

[4] This memorandum disposition is cited as an example of how judges of the Ninth Circuit have treated this issue in the past. Nørremark recognizes that the decision is not binding authority.

PAGE 7 -   MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

knowledge of the company's slowdown"); *Cho v. UCBH Holdings, Inc.*, No. C 09-4208 JSW, 2011 WL 3809903, at *17 (N.D. Cal. May 17, 2011) ("Evidence of a defendant's stock purchases * * * weighs against an inference of scienter"); *I.B.E.W. v. Limited Brands, Inc.*, 788 F. Supp. 2d 609, 631 (S.D. Ohio 2011) (defendants' stock purchases "undermine any inference of scienter").

**B.  Plaintiffs' Allegations Concerning Nørremark's Stock Sale Are Insufficient to Demonstrate the Sale Was "Suspicious."**

The overwhelming net *purchases* by the vast majority of Vestas insiders preclude a strong inference of scienter based on Nørremark's single sale of Vestas stock. And, the FAC also fails to plead facts showing that Nørremark's sale was suspicious in its own right.

**1.  Plaintiffs have not alleged sufficient facts for this Court to determine whether Nørremark's stock sale was inconsistent with his prior trading history.** Plaintiffs have failed to adequately allege that Nørremark's stock sale was inconsistent with his prior trading history outside the class period. Though plaintiffs allege that, "[i]n the two years preceding the Class Period, Nørremark did not sell a single share of Vestas stock" (FAC ¶ 81), plaintiffs provide no basis for considering only that two-year period. Plaintiffs thus have failed to meet their burden of alleging sufficient context for Nørremark's stock sale. *See, e.g., In re Nike, Inc.*, 181 F. Supp. 2d 1160, 1169 (D. Or. 2002) ("Plaintiffs failed to allege sufficient context of insider trades outside the class period * * * to determine if the trading during the class period is out of line with prior practices.").

**2.  Plaintiffs have not sufficiently alleged facts suggesting the amount of Nørremark's sale was significant.** Plaintiffs have also failed to plead facts suggesting that the *amount* of Nørremark's sale was significant. Plaintiffs allege that Nørremark sold "virtually all of his Vestas stock" in February 2010 (FAC ¶ 81) – an allegation based on the fact that Nørremark sold 3,000 of his 3,213 shares. (Urbach Decl. Exc. 2 at 117.) But the Ninth Circuit has warned that allegations about the amount of stock sold must include not only *shares* of stock,

PAGE 8 -   MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

710269.0001/5654152.1

**LANE POWELL PC**
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

but also *exercisable stock options*. *See, e.g., Ronconi*, 253 F.3d at 435 n.25 (9th Cir. 2001) ("Stock options should be considered in calculating the percentage of shares sold unless the insider could not have exercised them."); *In re Silicon Graphics Inc. Secs. Litig.*, 183 F.3d 970, 986-87 (9th Cir. 1999) (same). Plaintiffs have simply ignored the issue of whether Nørremark held any exercisable options. In fact, Vestas' Executive Management Group (Messrs. Nørremark and Engel) held 16,378 exercisable options at the end of 2010. Plaintiffs have failed to address those exercisable options, or to explain their failure to address them, and their allegations concerning concerning Nørremark's stock sales therefore cannot create any inference of scienter. *See, e.g., Wojtunik v. Kealy*, 394 F. Supp. 2d 1149, 1166 (D. Ariz. 2005) (where plaintiff "did not include ex[er]cisable stock options in alleging [defendant's] stock sales-related figures * * *, then the alleged figures have no probative value in determining whether the amount of stock sold is suspicious"); *Dalarne Partners, Ltd. v. Sync Res., Inc.*, 103 F. Supp. 2d 1209 (C.D. Cal. 2000) ("plaintiff nowhere pleads facts that would allow the Court accurately to assess the significance of [stock] sales" where complaint "does not specify what percentage of his holdings each of the defendants sold when stock options are included in the calculation").

**3.     Plaintiffs have failed to allege facts sufficient to demonstrate that the timing or scope of Nørremark's stock sale was, in itself, suspicious.** The fact that Nørremark sold his stock shortly after Vestas' announcement of its fiscal 2009 results (FAC ¶¶ 76-81) is not itself suspicious. "Officers of publicly traded companies commonly make stock transactions following the public release of quarterly earnings and related financial disclosures." *Lipton*, 284 F.3d at 1037. In fact, Vestas' internal policies only permitted Nørremark to trade in the four weeks following the publication of the annual report and quarterly reports. (Urbach Decl. Ex. 1 at 101.) Nørremark was thus complying with Vestas' insider trading policies when he sold his shares on February 15, 2010, just five days following the issuance of the 2009 Annual Report.

Furthermore, Nørremark sold his 3,000 shares at 272.64 DKK per share, while there were many times during which Nørremark could have sold his shares for substantially more.

PAGE 9 -   MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Following all but two of the allegedly misrepresentative financial reports, Nørremark was eligible to sell his shares for more, often substantially more, than the 272.64 DKK he sold for on February 15, 2010. Had Nørremark truly sought to maximize his own personal benefit in a way that would support a strong inference of scienter, he could have sold those same shares for as much as 429.50 DKK per share on May 5, 2009, which would have netted him an additional 470,580 DKK ($82,450.70). Nørremark's sales thus do not appear calculated to maximize the personal benefit from undisclosed inside information. Thus, an inference of scienter is inappropriate based on Nørremark's stock sale. *See, e.g. Ronconi*, 253 F. 3d at 435 (9th Cir. 2001)("When insiders miss the boat this dramatically, their sales do not support" an inference of scienter.)

Finally, though in some instances stock sales can be suspicious due to the high ratio of profits from the stock sale relative to the person's overall compensation, those facts are not present here. *Cf. In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (profits from stock sale nearly doubled *in one day* the total amount of compensations made over the previous three years for one officer and netted another officer *four times his annual salary*). Collectively, Nørremark and Engel only had the one stock sale of $144,160 during the class period, yet their collective earnings for 2009 alone exceeded $2.7 million. (Urbach Decl. Ex. 2 at 33-34.) Individually, assuming Nørremark's compensation was just 30% of the total executive management compensation, his earnings for 2009 would have exceeded $800,000. Here again, a stock sale of $144,160, would be less than one quarter of his annual salary. Whether viewed collectively, or on an individual basis, the ratio of Nørremark's sale compared to overall compensation is insufficient to form the basis of an allegation that the scope of the stock sale was suspicious such that it could create a strong inference of scienter.

Nørremark's single sale of Vestas shares cannot create a strong inference of scienter.

PAGE 10 - MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

    **C.**    **Confidential Witness Statements Do Not Create Inference of Scienter.**

        **1.**    **Nørremark did not make certain statements and, therefore, cannot be liable.**

The FAC contains several allegations about statements made in conference calls with investors where Engel, Nørremark, and Carlson were present. FAC paragraph 17, alleges that "defendants Carlson, Engel, and Nørremark * * * participated in conference calls with investors and securities analysts * * *" in which the company's financial performance was discussed. However, when the FAC makes more detailed allegations about those calls, it is clear that the referenced statements made in those calls were not made by Nørremark. FAC paragraph 39 alleges that "During conference calls with analysts and investors, Engel was the primary spokesman." Paragraph 63 asserts that in the April 28, 2009, conference call, "Engel informed investors * * *." Paragraph 68 claims that in the April 28, 2009, conference call, "Engel informed investors * * *;" in paragraph 78, "Engel stated * * *;" in paragraph 101, "Engel made the following statement * * *." As discussed in more detail below, paragraph 155 of the FAC alleges that at a company sales meeting at which Engel and Nørremark were present, a witness "heard Engel say * * *." None of these alleged statements were made by Nørremark. Since Nørremark did not make those statements, and because there are no allegations which attribute the statements to him, they cannot be a basis for the claims against him. *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. _, 131 S. Ct. 2296 (2011) (Maker of a statement is only the person who made it or who had ultimate control over its content).

        **2.**    **Statements Allegedly Made to at Rome Meeting and Reported by Confidential Witness Do Not Otherwise Create an Inference of Scienter.** The FAC contains a report from an unidentified confidential witness (the "CW") who allegedly claims to have heard Engel, Vestas' CEO, make a statement in late 2009 that supposedly contradicts public statements by Vestas that IFRIC 15 was viewed "not to be relevant to Vestas." Engel's supposed statement cannot be used to infer scienter of Nørremark, who did not make the statement.

PAGE 11 - MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Equally important, the CW's allegation does not meet standards imposed by the PSLRA, and cannot be used to infer the scienter of any defendant.[5]

In the Ninth Circuit, when a complaint uses the allegations of confidential witnesses to attempt to raise the inference of defendants' scienter, the statement of the confidential witness must pass two tests.  First, the identity of the confidential witnesses must be established with "sufficient particularity to establish their reliability and personal knowledge." *Zucco Partners*, 552 F.3d at 995, citing *In Re Daou Systems, Inc. Sec. Litig.*, 411 F.3d 1006, 1015-16 (9th Cir. 2005).  Second, the statements reported by a CW who has been described "with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* at 995.  The tests require the court to "look to 'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia.'" *Id.*, quoting *Novak v. Kasaks*, 216 F.3d. 300, 314 (2nd Cir. 2000).

The relevant CW allegations are contained in the FAC at paragraphs 18, 153, 154, and 155.  None meet the *Zucco Partners* standard.

In paragraph 18, in the FAC's introductory comments, the FAC alleges "in late 2009, Executive Management of Vestas – i.e., Engel and Nørremark – complained to the company's sales force during a private meeting in Rome, Italy, that IFRIC 15 would have a material negative effect on the company's 2010 financial reporting."  To the extent this assertion in the introductory paragraph is intended as anything other than a summary or introduction, it is contradicted by the subsequent allegation at FAC ¶ 155, which alleges that the statement at issue was made by Engel, and not by Nørremark.  The assertion in paragraph 18 is also contradicted by the subsequent allegation at paragraph 155 of the FAC, which claims only that Engel remarked that 2010 would be a "terrible year due to the pressures brought on by the economic

---

[5] There are other reports from other confidential witnesses at FAC ¶¶ 141-52, but they contain allegations of product quality and obsolete inventory levels, which are not relevant to the claims in the FAC, as demonstrated in the Vestas Defendants' Memorandum.

PAGE 12 - MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

crisis and the new accounting provision IFRIC 15." The contradictory nature of the allegations in paragraph 18 of the FAC cannot give rise to a strong inference of scienter. *Metzler Inv. GMBH v. Corinthian College, Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008) (plaintiff cannot avoid dismissal by reliance on isolated statement contradicted by other insufficient allegations).

Paragraph 153 of the FAC alleges that the CW, "a former Vestas director of business development," "learned about the revenue recognition change – *i.e.*, IFRIC – in late 2008, and throughout 2009." This allegation contains no specification of the job duties of a "director of business development," or of what the CW learned about the revenue recognition change, or how his position as a "director of business development" would place him in a position in the company to learn of the application of the IFRIC revenue recognition pronouncements to the company's accounting procedures. The application of IFRIC 15 is complicated and requires accounting judgment, and a witness's understanding of IFRIC 15 is critical to that witness's interpretation of another person's statement about IFRIC 15. It is critical to judging the witness's "reliability." Consequently, the allegations do not provide "sufficient detail about a confidential witness's knowledge or position to provide a basis for attributing the facts reported by that witness as the witness' personal knowledge." *Zucco Partners*, 552 F.3d at 995.

Paragraph 154 of the FAC fails to meet the first test of *Zucco Partners* that "the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their *reliability* and personal knowledge." (Emphasis added.) *Zucco Partners*, 552 F.3d at 995. FAC paragraph 154 demonstrates that the CW is not reliable as to matters involving IFRIC 15.

Paragraph 154 asserts:

> [T]he director of business development learned from Vestas executive management that accelerating delivery of wind turbines in 2010 would be much more important to the company because Vestas could not book revenue under the new accounting provision until risk of loss and ownership had transferred to the customer. The director of business development was well aware of the company's prior percentage of completion revenue recognition

PAGE 13 -  MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

>process because as a sales manager, 10% to 20% of the contract revenue would be recognized upon downpayment, 60% to 70% upon delivery of the nacelle and wind turbine blades, 10% upon erection of the tower and final assembly, and the final 10% being recognized after commissioning, i.e., proving performing of the product to a customer.

Again, it is doubtful that a director of business development has knowledge in such detail of the percentage of completion of revenue recognition process that paragraph 154 asserts, and as we have seen, there are no allegations in the FAC to suggest otherwise. In any event, there is no specific and particular allegation that this CW had that knowledge. More important, paragraph 154 demonstrates affirmatively that this CW is not a "reliable" witness. He asserts that he "learned from Vestas Executive Management that *delivery of wind turbines in 2010* would be more important to the company, because Vestas could not book revenue under the new accounting provision until risk of loss and ownership had been transferred to the customer." (Emphasis added.) But if IFRIC 15 requires the application of IAS 18 as to revenue from supply and install contracts (and that is what FAC alleges), the time of the delivery of the wind turbines by Vestas will have no effect on when the revenue is recognized. It was the *prior* accounting policy which recognized certain revenue – 60%-70% – on the delivery of the nacelles and wind turbines. The new policy – the application of IAS 18 – recognizes revenue only upon transfer of the risk of loss and ownership of the entire project to the customer. The allegations by the CW in paragraph 154 demonstrate that he is not reliable as to understanding what he "learned" from executive management toward the end of 2009, and that he does not understand IFRIC 15 – or IAS 18 or IAS 11. It does not matter that what the CW subsequently reports, in paragraph 155 of the FAC, is a supposed statement by Engel as to Engel's belief. Given the CW's misunderstanding of IFRIC 15 and its possible effect on the accounting policies of the company, the CW's recollection of Engel's comment on the effect of "the new accounting provision IFRIC 15" is not reliable. If the CW does not understand the application and effect of a new accounting policy (and in fact he gets it exactly backwards), his statement about what Engel supposedly said concerning the effect of a new accounting policy is subject to doubt.

PAGE 14 -   MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Paragraph 155 of the FAC also fails the second test of *Zucco Partners*. "Second, those statements which are reported by confidential witness with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco Partners*, 552 F.3d at 995.

Paragraph 155 alleges:

> [T]he purpose of the meeting was for executive management – i.e., Engel and Nørremark – to present and discuss the 2010 sales strategy among other things. During the Rome, Italy meeting, the director of business development heard Engel say that 2010 was going to be a terrible year due to the pressures on sales brought on by economic crisis and the new accounting provision IFRIC 15.

Presumably, plaintiffs intend to suggest that Engel's statement demonstrates that Engel knew in late 2009 that Vestas was going to have to change its accounting policy for revenue recognition on supply and install contracts in 2010, contradicting Vestas' public statements about IFRIC 15, demonstrating defendants' (or at least Engel's) scienter. But, in the context of a sales meeting, when senior executives are encouraging the sales force to redouble its efforts, Engel's statement is perfectly compatible with an inference of non-culpable intent.

In 2009, 30% of Vestas contracts were "supply only" contracts. (Urbach Decl. Ex. 23 at 3.) In supply only contracts, revenue is recognized on delivery of wind turbines. (Urbach Decl. Ex. 1 at 25.) So, even if the company were reclassifying its supply and install contracts under IFRIC 18, 30% of its revenue would still be recognized upon delivery of wind turbines. Moreover, Vestas' reclassification of its supply and install contracts under IAS 18 has no effect whatsoever on the company's cash flow. (Urbach Decl. Ex. 24 at 2.) Although Vestas may not recognize revenue under IAS 18 until the entire project is completed, it receives cash payments from its customers at various stages during the progress of the project. (Urbach Decl. Ex. 1 at 75-76.) In a cash-constrained environment, and the period of the financial crisis was certainly that, cash flow was vitally important to Vestas. Whether Vestas would reclassify its supply and install contracts or whether it would not, it was still vitally important that the Vestas sales force do its best to promote the sale of Vestas products and the subsequent delivery of wind turbines to

PAGE 15 - MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

LANE POWELL PC
601 SW SECOND AVENUE, SUITE 2100
710269.0001/5654152.1        PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

customers. In that context, Engel is simply making "a broader exhortation" to his sales professionals "to improve business." *Metzler*, 540 F.3d at 1069.

The *Metzler* court rejected, as evidence of scienter, a CW witness statement that is remarkably similar to that reported in paragraph 155. In *Metzler*, the defendant college was accused of intentionally exaggerating the number of "qualified" students it had admitted, to increase its federal funding and improve its financial performance. The complaint in that case relied in part upon a statement by a confidential witness that at a company-wide meeting, the defendant company's CFO told the company's admission officers that in deciding whether a student applicant was qualified or unqualified, they were operating "in a gray area." *Id*. The *Metzler* court noted "Beal's 'gray area' statement is susceptible to Metzler's characterization that it was intended as a winking suggestion that admission officers should perpetrate fraud. But it is equally susceptible to an interpretation, not unlikely given its utterance at a company-wide meeting, that Beal was simply making a broader exhortation to improve business." *Id*. Engel's statement is similarly susceptible to the interpretation that he was telling the sales force not to worry about market rumors or discussions about accounting issues; the sale and the delivery of wind turbines to Vestas' customers continued to be vitally important to the Vestas' financial performance – to its recognition of revenue in its supply only contracts and to its cash flow as to any of its contracts – and the sales force should vigorously pursue wind turbine sales and delivery. The allegations of the CW do not meet the strict standards imposed by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 127 S. Ct. 2499, 2504-05 (2007) (allegation of inference of scienter must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged") and therefore do not give rise to an inference of scienter.

PAGE 16 -  MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

## IV. CONCLUSION

For the reasons set forth above and in the Vestas Defendants' Memorandum, plaintiffs' claims should be dismissed in their entirety.

DATED: April 22, 2013

LANE POWELL PC

By  s/ Tanya D. Urbach
   Milo Petranovich, OSB No. 813376
   Tanya D. Urbach, OSB No. 962668
   Telephone: 503.778.2100
Attorneys for Defendant Henrik Nørremark

PAGE 17 -  MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

710269.0001/5654152.1

**LANE POWELL PC**
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200