**Milo Petranovich**, OSB No. 813376
petranovichm@lanepowell.com
**Tanya D. Urbach**, OSB No. 962668
urbacht@lanepowell.com
**LANE POWELL PC**
601 SW Second Avenue, Suite 2100
Portland, Oregon 97204-3158
Telephone: 503.778.2100
Facsimile: 503.778.2200

Attorneys for Defendant Henrik Nørremark

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| In re IN RE VESTAS WIND SYSTEMS A/S SECURITIES LITIGATION | Case No. 3:11-cv-00585-AC <br><br> <u>CLASS ACTION</u> |
| This Document Relates To: <br><br> ALL ACTIONS. | Defendant Henrik Nørremark's REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT |

## I. **INTRODUCTION**

Plaintiffs' first amended complaint (the "FAC") must be dismissed as to Defendant Henrik Nørremark because Plaintiffs' allegations fail to create a strong inference of scienter. As argued more extensively in the memoranda submitted by Nørremark's co-Defendants in this action,[1] there are more plausible reasons for each and every one of the facts and circumstances

---

[1] Nørremark incorporates by reference the additional arguments in favor of dismissal, which apply to all Defendants, asserted by Defendants Vestas Wind Systems A/S and Vestas-American

PAGE 1 -   REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'
           FIRST AMENDED COMPLAINT

alleged in the FAC than Plaintiffs' theory that Nørremark and the other Defendants intentionally deceived investors. Since Plaintiffs' conspiracy theory is not as compelling as other explanations for the facts alleged, the FAC must be dismissed.

Plaintiffs' primary argument is that Defendants knew, or were deliberately reckless in not knowing, that application of IFRIC 15 was mandatory. (Op.[2] at 25.) But this argument already misses the point: Defendants do not dispute that IFRIC 15 is mandatory. Rather, Defendants initially believed that IFRIC 15 did not apply to the types of contracts Vestas had. IFRIC 15 on its face applies to "agreements for the construction of real estate," which does not appear to describe Vestas' supply-and-installation contracts for wind turbines. Even if IFRIC 15 did apply, moreover, it does not rule out "percentage-of-completion" accounting, but rather requires a company to make a judgment about whether percentage-of-completion accounting is appropriate for a given contract. That judgment must consider the degree of control held by the customer in specifying the design and structure of the particular project. If the customer has sufficient control, IFRIC 15 allows percentage-of-completion accounting, but if the project is not sufficiently customizable, revenue cannot be recognized until all risk has been transferred to the customer. In short, Defendants believed that they <u>had</u> implemented IFRIC 15, but because it did not appear to apply to their wind turbine contracts, it had little effect.

Then, in June 2010, the IASB issued an "Exposure Draft" that was intended to move toward a universal standard for revenue recognition for <u>all</u> types of contracts, regardless of the degree of customization. That new standard (which has not yet been officially adopted) calls for revenue recognition only upon transfer of risk to the customer. In light of the Exposure Draft and its endorsement of transfer-of-risk accounting, Defendants' views changed, and in October

---

Wind Technology, Inc. (the "Vestas Defendants") in their separate motion to dismiss and related memoranda.
[2] "Op." refers to Plaintiffs' Consolidated Opposition to Vestas Wind Systems A/S, Vestas-American Wind Technology, Inc. and Nørremark's Motions to Dismiss Plaintiffs' First Amended Complaint.

PAGE 2 -   REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

2010 they disclosed to investors the likely need to restate their financials in accordance with the Exposure Draft and IFRIC 15.

So Plaintiffs' argument that PWC "warned" IFRIC 15 was mandatory is beside the point. It was only mandatory if it applied to the wind turbine contracts, and even then, only if the customer did not have sufficient control over the customization of the project. Plaintiff's opposition mischaracterizes and overstates their threadbare allegations: looking at the allegations themselves, all we see are post-hoc characterizations of PWC's supposed warnings by uninvolved parties, in addition to very general contemporaneous statements by PWC regarding IFRIC 15 that do not constitute "warnings" at all. These alleged warnings do not even mention wind turbine contracts, much less Vestas' particular kinds of supply-and-installation wind turbine contracts. Plaintiffs have not alleged a single direct communication from PWC to any Defendant indicating that IFRIC 15 applied to Vestas' supply-and-installation contracts for wind turbines.

Obviously needing more, Plaintiffs attempt to supplement their scienter allegations against Nørremark in two ways. First, they note that he sold the majority of his Vestas stock on February 15, 2010. But, there is nothing suspicious about this sale. For one thing, none of the other insiders sold their stock. Why would only Nørremark dump his shares and not Engel and Carlsen? In fact, Engel and Carlsen each <u>bought more</u> Vestas stock on August 19, 2010. Also, why would Nørremark risk potential liability to save himself less than $16,000 when his annual compensation exceeded $800,000?[3] Nor is the timing suspicious, Nørremark was selling during one of the few trading windows allowed by Vestas' insider trading policy. Nor have Plaintiffs alleged that this was unusual for Nørremark; they say he had made no other sales in the previous

---

[3] Plaintiffs argue that the largest stock price drop occurred on August 18, 2010, just before Engel and Carlsen bought more Vestas shares. But even if Nørremark had waited until then to sell his 3,000 shares (which under Plaintiffs' theory was a good time to buy and a bad time to sell) instead of selling them on February 15, 2010, the difference would have been only about $15,900, less than 2% of his approximately $800,000 annual compensation. If he had continued to hold it until the end of the class period, the total difference would still be only $54,484, less than 7% of his annual compensation. *See infra*, Section II.B.5.

PAGE 3 -   REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

two years, but do not explain why that is the appropriate frame of comparison. Plaintiffs have simply failed to show that Nørremark's stock sale was suspicious.

Second, Plaintiffs argue that Nørremark (and Engel) must have anticipated IFRIC 15-related doom because a confidential witness ("CW") allegedly claims that Engel told his sales team so in late 2009 at a sales meeting in Rome. This allegation is implausible for a number of reasons and should be disregarded. Why would Engel discuss complicated and potentially controversial accounting and revenue recognition issues with his sales team? Is it plausible that a business development director took notice of a comment on a specific accounting provision, understood it, and accurately remembered it approximately a year later? If so, why does only one person remember this alleged statement allegedly made at a "large annual sales meeting?" Isn't it more likely that <u>if</u> Engel made statements regarding the poor year that he allegedly expected in 2010, that this was intended to encourage his sales team to perform, and not to express his views on the company's revenue recognition policies? Finally, if Defendants were engaging in a conspiracy to intentionally deceive their investors, why would they disclose it to their sales team?

Neither Nørremark's stock sale nor the alleged statement of the CW can create a strong inference of scienter, either independently, together, or in combination with Plaintiffs' other allegations. Because Plaintiffs' conspiracy theory is not as plausible as other explanations for these alleged facts, they cannot state a claim against Nørremark, and the FAC must be dismissed.

## II. ARGUMENT

### A. Scienter Standard.

To adequately plead scienter, Plaintiffs must "'state with particularity facts giving rise to a strong inference that the Defendant' * * * 'made false or misleading statements either intentionally or with deliberate recklessness.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009) (quoting 15 U.S.C. § 78u-4(b)(2); *In re Daou Systems, Inc.*, 411 F.3d 1005, 1014-15 (9th Cir. 2005)). The Supreme Court in *Tellabs, Inc. v. Makor Issues &*

PAGE 4 - REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

*Rights, Ltd.*, 551 U.S. 308 (2007) held that such pleading is adequate "only if a reasonable person would deem the inference of scienter [1] cogent and [2] at least as compelling as any opposing inference one could draw from the facts alleged." (Emphasis added.) In other words, if any innocent explanation for the facts alleged is more compelling than the plaintiff's theory of scienter, the FAC must be dismissed. In this case, each any every plausible fact Plaintiffs allege is easily explained without resort to Plaintiffs' conspiracy theory. Therefore, Plaintiffs have not pled a strong inference of scienter against Nørremark and the FAC must be dismissed.

B. **Plaintiffs' Allegations Regarding Insider Trading Do Not Create a Strong Inference of Scienter.**

Plaintiffs contend that their allegations concerning Nørremark's stock sale "serve to strengthen the inference of scienter in the FAC as to Nørremark and Vestas" when the FAC is considered in its entirety. (Op. at 37.) Though Plaintiffs are correct that the Court should view the FAC in its entirety, Plaintiffs have utterly failed to plead sufficient facts to raise any inference of scienter concerning Nørremark's stock sale – whether the sale is considered in isolation or as one of many allegations in the FAC viewed together. Due to Plaintiffs' failure to plead enough additional facts concerning the overall context of Nørremark's stock sale, the sale cannot raise any inference of scienter and thus lends nothing to the inquiry concerning scienter when the FAC is viewed in its entirety.

As is set forth more particularly in Nørremark's Memorandum in Support of Motion to Dismiss ("Nørremark's MTD"), "insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *Zucco Partners*, 552 F.3d at 1005; *see also* Nørremark's MTD at 5. To meet this standard, Plaintiffs must allege for the Court's consideration facts demonstrating "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.*

PAGE 5 -  REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
710269.0001/5774332.4    PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

**1. Plaintiffs' failure to allege corroborative sales defeats any potential for Nørremark's sale to create any inference of scienter.** In *Metzler Inv. GmbH v. Corinthian Colleges,* the Court stated that corroborative sales are typically required to allow insider trading to support an inference of scienter. *Metzler*, 540 F.3d 1049, 1067 (9th Cir. 2009); *see also Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir. 2001) (one well-timed sale simply does not create a strong inference of scienter "where the other equally knowledgeable insiders" acted inconsistent with such an inference). Plaintiffs did not allege any other sales by any insiders. Thus, Nørremark's sale should not be allowed to support an inference of scienter, with respect to either Nørremark or Vestas.

Plaintiffs' theory that Nørremark's sale supports an inference of scienter is further undercut by Plaintiffs' own allegations. The FAC is replete with allegations that the other individual Defendants, Engel and Carlsen, were aware that IFRIC 15 applied to supply-and-installation contracts for wind turbines and that Vestas purportedly needed to change its revenue recognition practices. (*See, e.g.*, FAC ¶¶ 9, 14, 15, 17.) And, in their opposition brief, Plaintiffs have alleged and argued strenuously that both Engel and Nørremark can be effectively imputed with all knowledge of the company's financial matters. (Op. at 25-26.) Plaintiffs do not, however, allege that Engel also sold shares to take advantage of the allegedly fraudulent scheme. Of course, they cannot so allege, because he did not sell any shares at all – and actually purchased 2,000 during the putative class period. Carlsen, who is also charged with knowledge of the allegedly fraudulent scheme, also did not sell any shares – and, he, too, purchased 8,000 shares during the putative class period.[4] The lack of corroborative sales and the purchases of

---

[4] Plaintiffs argue that Engel's later purchase of Vestas shares during the class period supports their theory of scienter. Plaintiffs are wrong. First of all, Engel was again purchasing shortly after an earnings announcement, which was consistent with – indeed, required by – Vestas' insider trading policy. Moreover, as further explained in the Vestas Defendants' memoranda, the decline in Vestas' stock price that occurred in July 2010, had nothing to do with IFRIC 15. The IFRIC 15-related write downs occurred later in that year, after Engel and Carlsen had collectively purchased 10,000 additional Vestas shares. But even if (as Plaintiffs insist) Engel's and Carlsen's purchases do not undermine any evidence of scienter, their lack of corroborative sales certainly does.

PAGE 6 -   REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'
              FIRST AMENDED COMPLAINT

additional shares, combined with these insiders' alleged knowledge of the scheme, nullify Nørremark's stock sale as support for any inference of scienter against Nørremark or Vestas.

**2. Plaintiffs' failure to allege facts that give rise to suspicion as to the timing of Nørremark's sale also prevents the sale from serving as any evidence of scienter.** The insufficiency of Plaintiffs' allegations with respect to the timing of Nørremark's sale also prevents the sale from serving as any evidence of scienter. Though Plaintiffs allege that Nørremark sold his shares "at prices twice as high compared to when Defendants fully disclosed their fraud" (FAC ¶ 81), Plaintiffs ignore the facts that (1) Nørremark sold in the days following Vestas' 2009 Annual Report in compliance with Vestas' insider trading policy, and (2) Nørremark, had he intended to sale at artificially inflated prices, could have sold for nearly twice as much as he did during the putative class period. Plaintiffs allege no facts to explain why, if Nørremark was in fact acting with such allegedly nefarious intent, he did not sell when it was significantly more profitable to do so. Thus, Plaintiffs' allegations concerning the timing of Nørremark's sale cannot create an inference of scienter. *Ronconi*, 253 F.3d at 435 (where someone so drastically misses the boat, there can be no inference he was trading on inside information.).

**3. The *Metzler* Court dismissed plaintiffs' complaint, because plaintiffs' failed to allege sufficient corroborative sales and failed to allege facts that gave rise to suspicion with respect to the timing of the insider trades; this Court should dismiss for the same reasons.** Plaintiffs' shortcomings in the present case with respect to their stock sales and timing allegations are similar to the shortcomings in *Metzler*. In *Metzler*, two defendants, Moore and Beal, sold a total of $33 million in Corinthian stock, which constituted 37% of Moore's holdings and 100% of Beal's. The other alleged insider, Digiovanni sold no stock at all. The *Metzler* Court also found nothing in plaintiffs' allegations that implied anything particularly suspicious about the timing of the sales. Because there were no corroborative sales and there was nothing suspicious about the timing of the sale, when viewed as a whole, the allegations failed to raise

PAGE 7 -   REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'
          FIRST AMENDED COMPLAINT

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
710269.0001/5774332.4                PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

the necessary strong inference of scienter required under the PSLRA.  *Metzler*, 540 F.3d at 1067.  In the present case Plaintiffs allege *no* corroborative sales whatsoever.  Furthermore, when viewed in the context of Vestas' insider trading policy and the overall stock price during the putative class period[5], Plaintiffs allegations infer nothing suspicious with respect to the timing.  Accordingly, this Court should come to the same conclusion as the *Metzler* Court and dismiss the FAC.

4.	**Nacchio is inapposite.**  Plaintiffs cite to *United States v. Nacchio*, 519 F.3d 1140 (10th Cir. 2008) for the proposition that awareness of a risk that projections might not be met is sufficient to establish scienter.  (Op. at 37, n.25).  Plaintiffs' simply misconstrue that case.  In *Nacchio*, there was testimony that "analysts would be surprised at the magnitude of the transactions, and that the stock price would go down some amount."  519 F.3d at 1166.  There was testimony that the defendant had deliberately timed the release of information to investors to convey the impression that the defendant had not been aware of the need to revise the company's guidance.  That has little to do with this case, where the issue is whether Nørremark knew IFRIC 15 would need to apply not only to real estate contracts, but also to supply-and-installation contracts for wind turbines – and that, if it did apply, it would require Vestas to change its accounting for those contracts based on the particular contracts' degree of customization (or lack thereof).  If knowledge of any risk of a restatement could imply scienter, then any stock sale by an insider could be used to allege scienter.

5.	**Additional "motive allegations" of the type cited by Plaintiffs, including Nørremark's stock sale – do not give rise to any inference of scienter.**  Plaintiffs also cite Nørremark's stock sale amongst their "additional motive" allegations that "further strengthen an inference of scienter."  (Op. at 36.)  In *In re Rigel Pharmaceuticals, Inc. Securities Litigation*, 697 F.3d 869 (9th Cir. 2012), the plaintiff contended certain allegations regarding motive bolstered its scienter pleadings.  Among those motive allegations plaintiff cited to its allegations

---

[5] *See* Nørremark's Memorandum of Law in Support of Motion to Dismiss at 4-5.

PAGE 8 -	REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

that the individual defendants had known that they would receive higher salaries, bonuses, and stock options and that the value of their stock options would increase substantially if Rigel reported positive results from the clinical trial. *Rigel*, 697 F.3d at 884. There the Court held:

> [A]llegations of routine corporate objectives such as the desire to obtain good financing and expand are not, without more, sufficient to allege scienter; to hold otherwise would support a finding of scienter for any company that seeks to enhance its business prospects. * * * In addition, it is common for executive compensation, including stock options and bonuses, to be based partly on the executive's success in achieving key corporate goals. Thus, especially given *Tellabs* and the requirement that we take into account plausible opposing inferences, we will not conclude that there is fraudulent intent merely because a defendant's compensation was based in part on such successes.

*Id.*

Here, there is a plausible opposing inference do be drawn from Nørremark's stock sale – to wit, Nørremark was selling his stock in line with Vestas' insider trading policy, nothing more. Accordingly, Plaintiffs' allegations even when viewed as potential motive, fail to rise to the level of creating an inference of fraudulent intent.

This fact is made particularly plain when one calculates the actual upside for Nørremark of his sale. Though Nørremark sold nearly all of his Vestas shares on February 15, 2010, the total value paled in comparison to his annual salary, much less the marginal savings achieved by selling his stock before the price dropped. While Nørremark likely stood to earn in excess of $800,000 in 2009, the total yield from his sale of 3,000 shares of Vestas stock at approximately $48.05 per share (272 DKK) in February 2010 was $144,160 (816,000 DKK). The largest stock decline that occurred after the August 18, 2010 guidance revision is alleged to be 23% (recall, of course, that Engel and Carlsen purchased stock in Vestas after this first guidance revision, even though Plaintiffs allege they knew more write-downs were to come).[6] At the close of trading on August 17, 2010, Vestas' share price was 314.50 DKK. After the August 18, 2010

---

[6] As noted in the memoranda filed by the Vestas Defendants, this first guidance revision had nothing to do with IFRIC 15.

PAGE 9 -   REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

announcement, the price closed down 23.05% at 242 DKK. Had Nørremark waited and sold after the 23% drop in the Vestas share price at 242 DKK, he still would have netted 726,000 DKK or $128,260. So Nørremark's allegedly devious stock transaction netted him a total of $15,900 additional dollars. It is implausible that Nørremark would risk personal liability to save $15,900 when his annual salary at the time was something in the neighborhood of $800,000.00.[7] More plausible, Nørremark sold in compliance with Vestas' insider trading policy, presumably because he needed additional liquidity at the time.

Because Plaintiffs have failed to allege anything suspicious concerning the overall circumstance in which Nørremark sold his shares, the stock sale simply cannot create any inference of scienter, whether viewed in isolation or in the context of Plaintiffs' overall FAC.

**C.  The Confidential Witness Statements Are Insufficient to Create a Strong Inference of Scienter.**

A CW statement cannot create a strong inference of scienter unless both (i) the FAC adequately pleads the CW's reliability and personal knowledge, and (ii) the pleaded CW's statements themselves give rise to an inference of scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d at 995. To determine the CW's reliability and knowledge, the court must consider the number of CW sources, the intrinsic reliability of those CWs, the level of detail they provide, the extent to which they are corroborated, and the <u>coherence and plausibility</u> of their statements. *See id.* To adequately plead the required "strong" inference of scienter, the proffered inculpatory inference must be "cogent" and "at least as strong" as any opposing exculpatory inference. *Tellabs*, 551 U.S. at 324.

**1.  The CW lacks accounting experience or understanding and is unreliable**. First, plaintiff have failed to establish that the CW has the requisite experience or understanding of revenue recognition to be able to understand and accurately recall an alleged statement by

---

[7] As noted above, even if Nørremark had waited until the very end of the Class Period, the total difference would have still been only about $54,000, less than 7% of his approximate annual compensation.

PAGE 10 -  REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Engel during a sales meeting more than a year earlier. Plaintiffs would have the Court believe that a business development manager – a salesman – with no alleged expertise in accounting, took particular note of, and understood, a supposed statement by Engel about IFRIC 15 <u>more than a year before</u> Vestas' change of accounting policy and restatement brought general attention to the relevance of IFRIC 15. This simply is not plausible.

The extent to which the CW understood complicated revenue recognition pronouncements in late 2009 is essential to evaluating the reliability of the CW's report of Engel's supposed statement about a matter involving such complex accounting matters. Plaintiffs have failed to plead any facts to support such understanding and, therefore, their allegations are insufficient to establish the reliability of the CW on this topic.Plaintiffs argue that they have alleged the CW's familiarity with the different accounting rules, but they do so by simply restating in the FAC what those accounting rules are. (Op. at 31 (citing FAC ¶ 154).)[8] Plaintiffs provide no facts about the CW's experience with accounting, nor any explanation for why a sales manager would be concerned with the details of revenue recognition. In light of the complexity of IFRIC 15, the time that has passed since the sales meeting in question, and the fact that IFRIC 15 and the Exposure Draft have since then been announced publicly as the cause for a restatement, it is more likely that the non-expert CW looking back at the 2009 meeting is simply mistaken about what Engel said.

    **2.  The CW's statement is uncorroborated.** Further doubt is cast by the fact that <u>no other witness</u> is alleged to have heard Engel make this supposed statement about IFRIC 15.

---

[8] Even then they get it wrong. The opposition recites that the CW learned "that under the new IFRIC 15, 'Vestas could not book revenue * * * until the risk of loss and ownership had transferred to the customer.'" First, that is not the language in IFRIC 15. Second, percentage-of-completion accounting is entirely acceptable under IFRIC 15, depending on the contract's degree of customization. (*See* Declaration of Jonathan Richman in Support of Motion to Dismiss ¶ 7; IFRIC Interpretation 15; Ex. 5 at 2, 3.) As to the first, specificity in the language of accounting rules is as important as specificity in pleading facts under the PSLRA; neither the FAC nor Plaintiffs' Opposition contain the specificity required by either. As to the second, a complete understanding of when IFRIC 15 allows, and does not allow, percentage-of-completion is essential to understanding Engel's alleged statement about IFRIC 15 in 2009. Neither the FAC nor Plaintiffs' opposition demonstrate such an understanding.

PAGE 11 - REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'
     FIRST AMENDED COMPLAINT

*See Zucco Partners*, 552 F.3d at 995 (noting that the court must consider the number of CWs that corroborate a particular allegation). Plaintiffs allege that Engel made his statement about revenue recognition to a yearly gathering of the Vestas sales force. (FAC ¶¶ 18, 134, 155.) But, Plaintiffs do not allege than anyone else present at this "large annual sales meeting" can corroborate what the CW supposedly heard. This also makes the CW's statement highly dubious.

Plaintiffs argue that the CW's statement is corroborated by PWC's account of its advice (*see* Op. at 30), but that simply is not true. The only account allegedly given by PWC of its earlier advice was a potentially self-serving statement from someone who had not been involved at the time. (*See* FAC ¶ 105 ("Mr. Holtung * * * was not able to provide details of previous discussions * * * as he was not the auditor at the time.").) And PWC's accountant stated only that PWC had advised Vestas of IFRIC 15's mandatory nature. In fact, there is no allegation that PWC told Vestas either (i) that IFRIC 15 applied to contracts for the supply-and-installation of wind turbines or (ii) that Vestas' particular types of supply-and-installation contracts did not qualify for the continued use of percentage-of-completion accounting under IFRIC 15. In short, Plaintiffs attempt to take one completely unreliable statement by a salesman with no alleged accounting expertise or understanding, and then Plaintiffs try to "corroborate" that statement with the separate statement of someone who was admittedly unaware of the relevant facts. Zero plus zero is still zero.

      **3.**    **The CW's statement is facially implausible.** The CW's statement itself demonstrates both that the CW lacks reliability and that Engel likely did not make the statement attributed to him. Plaintiffs' opposition recasts the FAC's allegations that Engel stated "2010 was going to be a terrible year due to * * * the economic crisis and the new accounting provision, IFRIC 15" (FAC ¶ 155), into the assertion that "Engel was explicitly acknowledging that 2010 <u>sales</u> would suffer as a result of its [IFRIC 15] implementation." (Op. at 31 (emphasis added).) But a change in revenue recognition policies would have no effect on <u>sales</u>.

PAGE 12 - REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'
         FIRST AMENDED COMPLAINT

Similarly, FAC ¶ 154 alleges that "Towards the end of 2009 the director of business development learned from Vestas Executive Management that accelerating delivery of wind turbines in 2010 would be much more important to the company because Vestas could not book revenue under the new accounting provision until risk of loss and ownership has transferred to the customer." But, even if it were assumed that Engel would address revenue recognition with his sales team, accelerating additional deliveries of wind turbines in 2010 would affect Vestas' 2010 revenues under IFRIC 15 only if the transfer of the project's control and ownership was completed in 2010. Rather, it is under Vestas' prior accounting policy that accelerating delivery of turbines in 2010 would necessarily improve Vestas' revenue in 2010, because under the prior policy revenue associated with the turbines would be recognized when the turbines were delivered.

Plaintiffs recognize the difficulty this presents to their theory of scienter, and they try to minimize that difficulty by pointing out that "the delivery of wind turbines is a necessary precursor to transfer of risk of loss and ownership" (Op. at 30). Of course it is, just like 2009 must come before 2010, or like the filing of a complaint must come before its dismissal. However, the FAC contains no allegations as to the length of time between the date when turbines are installed in a supply-and-installation contract and the subsequent date when control and ownership are transferred. And so the Court is left to speculate as to whether, or to what extent, a "bad year" in 2010 could be remedied in 2010 by accelerating delivery of turbines in 2010. On the other hand, if Engel believed Vestas' prior revenue recognition policy for supply-and-installation contracts still applied, revenue for such contracts would be recognized in 2010 when turbine delivery occurred in 2010. The implication of scienter which plaintiffs seek to infer from Engel's supposed statement about the importance of accelerating delivery is neither cogent nor as least as likely as the opposing exculpatory explanation of Engel's alleged statement.

PAGE 13 -  REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'
            FIRST AMENDED COMPLAINT

**LANE POWELL** PC
601 SW SECOND AVENUE, SUITE 2100
710269.0001/5774332.4                    PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

The CW statements are implausible for an independent reason. Plaintiffs allege that Vestas' executive management was lying to investors throughout 2009 and 2010 about the applicability of IFRIC 15. If that were the case, having allegedly gone to great lengths to conceal the applicability of IFRIC 15, it would be utterly irrational for the supposed conspirator to announce the "hidden truth" at a "large annual sales meeting." It is not plausible.

**4.    It is far more plausible that Engel said nothing about IFRIC 15 at the sales conference.** Plaintiffs' allegations simply make much more sense if one assumes that Engel in fact made no reference to IFRIC 15 at all. Given the timing of the sales conference, it would be perfectly natural for Engel to remind the sales force of the continuing economic crisis, just as Vestas' third quarter interim report in October 2009 notes that the expected revenue in 2010, "reflects the uncertainty caused by the credit crisis in the short term." (Third Quarter Interim Report, Decl. of Jonathan Richman, Ex. 15 at 3.)

It would make perfect sense for Engel to urge his sales team to sell more wind turbines in 2010, because, as demonstrated above and in the motion to dismiss, irrespective of when revenue is recognized in a supply-and-installation contract, the revenue recognition policy does not affect cash flow. Those contracts still provide for interim cash payments to Vestas during the period of the contract performance, even if revenue could not be recognized until project completion. Even in accrual accounting, cash is important, and in a down economy, it is vital.

Finally, to the extent Engel would discuss accounting with his sales team at all and exhort the sales team to accelerate delivery of turbines in 2010, this would be consistent with his belief that Vestas' prior revenue recognition policy for supply-and-installation contracts still applied, as Vestas could recognize revenue in 2010 upon wind turbine delivery. In contrast, the CW's statement that Engel told them to deliver more wind turbines in 2010 in order to improve Vestas' 2010 financials in light of IFRIC 15 is nonsense, and it is contrary to Plaintiffs' entire theory of scienter – that Vestas management conspired to conceal the applicability of IFRIC 15 and the

PAGE 14 -    REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

**LANE POWELL PC**
601 SW SECOND AVENUE, SUITE 2100
710269.0001/5774332.4    PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200

Exposure Draft. The innocent explanations of Engel's comment are more compelling than Plaintiffs' theory of scienter based on the CW's statement.

### III. CONCLUSION

For the reasons stated herein, the FAC should be dismissed as to Nørremark.

DATED: August 5, 2013

                          LANE POWELL PC

                          By */s/ Milo Petranovich*
                              Milo Petranovich, OSB No. 813376
                              Tanya D. Urbach, OSB No. 962668
                              Telephone: 503.778.2100
                     Attorneys for Defendant Henrik Nørremark

PAGE 15 - REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS'
              FIRST AMENDED COMPLAINT

710269.0001/5774332.4

**LANE POWELL PC**
601 SW SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204-3158
503.778.2100 FAX: 503.778.2200